IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| PHILLIP MARTIN, | ) | CIVIL NO. 07-00513 JMS/BMK |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING IN PART AND |
| | ) | DENYING IN PART DEFENDANTS' |
| v. | ) | MOTION FOR SUMMARY |
| | ) | JUDGMENT |
| ROBERT M. GATES, SECRETARY, | ) | |
| DEPARTMENT OF DEFENSE, | ) | |
| DEFENSE COMMISSARY | ) | |
| AGENCY; JOHN DOES 1-10; DOE | ) | |
| ENTITIES 1-10; | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

## I. <u>INTRODUCTION</u>

Plaintiff Phillip Martin ("Plaintiff" or "Martin"), asserts that his employers, Robert M. Gates, Secretary of the Department of Defense, and the Defense Commissary Agency ("DeCA") (collectively "Defendants"), retaliated against him in violation of Title VII of the Civil Rights Act for reporting sexual harassment and filing two Equal Employment Opportunity ("EEO") complaints.

Currently before the court is Defendants' Motion for Summary Judgment. Based on the following, the court GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment.

## II.  BACKGROUND

### A.    Factual Background

In June 2003, Martin, a Filipino man, began working for Defendants as a permanent, intermittent Sales Store Checker ("Cashier")[1] at the Pearl Harbor Commissary in Honolulu, Hawaii ("Commissary").  Martin Decl. ¶ 2.  At the Commissary, Martin worked with a fellow Cashier Maria Nickels ("Nickels") who is also Filipino.  *Id.* ¶ 4.  Martin alleges that Nickels sexually harassed him in late 2004 over the course of three to four months.  *Id.*; Defs.' Ex. 1, at 40, 65.[2]  On November 12, 2004, Martin delivered a letter documenting Nickels' alleged sexual harassment to his second-level supervisor, Customer Service Department Manager Linda Carr ("Manager Carr").  Martin Decl. ¶ 7; Pl.'s Ex. 2; Carr Decl. ¶¶ 1, 2.

After Martin complained, Manager Carr obtained a written statement from Nickels, who denied Martin's accusations and instead claimed that Martin had sexually harassed her.  Carr Decl. ¶ 3.  In response to Martin's and Nickels'

---

[1]  As a Cashier at the Commissary, Martin's duties and responsibilities included, but were not limited to: operating a cash register; checking patron identification and ration cards at entry and time of purchase; totaling purchases and making correct change; checking and adjusting prices; accepting payment in the approved methods; making corrections or voiding purchases; receiving "change fund" and "checks cash drawer"; returning all currency and preparing a reconciliation report at the end of each shift; and, if necessary, verifying the "change fund" and amount of currency received during a shift.  Martin Decl. ¶ 3.

[2]  Martin has not alleged a sexual harassment claim in his Complaint.  *See* Pl.'s Opp'n 18. As a result, this Order does not address that issue.

complaints, Manager Carr arranged the schedule so the two would not work together. *Id.*

Martin asserts that after he reported Nickels' sexual harassment to Manager Carr, she and his other supervisors retaliated against him. Pl.'s Opp'n 20-26. On December 8, 2004, Manager Carr called Martin into her office and was generally dismissive of his complaint -- saying his complaint "had no effect at all" and was "nothing." *Id.* The next day, Martin was called into a meeting with three supervisors -- his third-level supervisor, Administrator Susan Campbell ("Admin. Campbell"), his first-level supervisor, Assistant Manager Tina Hogan ("ASM Hogan"), and Human Resource Manager Ken Borja ("HR Manager Borja"). *Id.* ¶ 10. At this meeting, HR Manager Borja -- presumptively speaking for the group -- was generally dismissive of Martin's complaint; informed him that Nickels planned to file a counter-complaint; told him to get a lawyer; asked him to apologize; and threatened that if he did not apologize the investigation would continue, his employment would "be affected[,]" he would receive a letter of reprimand, or he would lose his job. Martin Decl. ¶ 10; Pl.'s Ex. 7, at unmarked page 2.[3]

---

[3] At the December 9, 2004 meeting, Martin also asserts that HR Manager Borja stated that he believed in forgiveness as a Catholic and when Martin replied that he admired him for his

(continued...)

Between the December 9, 2004 meeting and Martin's first EEO complaint two months later, Martin claims that his supervisors engaged in the following adverse actions: (1) on December 10, 2004, Manager Carr refused to give him a copy of Nickels' allegations against him and to talk to him without a union representative present, Martin Decl. ¶ 11; Pl.'s Opp'n 21; (2) ASM Hogan informed him that Nickels would proceed with her EEO cross-complaint against him because he did not apologize, Martin Decl. ¶ 13; Pl.'s Opp'n 21; (3) ASM Hogan and "Agency representatives"[4] lied to him about Nickels' EEO cross-complaint, Martin Decl. ¶ 14; Pl.'s Opp'n 21; (4) on January 15, 2005, Manager Carr "messed up the schedule" and assigned Martin to work with Nickels, Martin Decl. ¶ 15; Pl.'s Opp'n 22;[5] (5) after Martin reported Cashiers Nickels and Elvira Kellaway for stealing, Manager Carr and ASM Hogan called Martin in to an office, accused him of harassing his co-workers, told him not to talk to anyone, and to "mind [his] own business or be subject to severe disciplinary action[,]"

---

[3](...continued)
beliefs, HR Manager Borja took offense and threatened him: "don't ever tell me that because of my crucifix you might forgive her, if you say that, the more [sic] I will send you a termination letter!" Martin Decl. ¶ 10(g).

[4] Martin does not name the "Agency representatives" but may refer to Admin. Campbell and HR Manager Borja because they attended the December 9, 2004 meeting where Borja told Martin that Nickels planned to file an EEO cross-complaint. *See* Martin Decl. ¶ 10.

[5] Because Manager Carr inadvertently scheduled Martin and Nickels to work at the same time, she arranged for them to work at opposite ends of the Commissary. Carr Decl. ¶ 3.

Martin Decl. ¶¶ 16, 18; Pl.'s Opp'n 23; (6) on February 1, 2005, ASM Hogan ordered Martin to take his fifteen minute lunch break after 6:00 p.m., forced him to take his next break immediately afterwards, and when he resisted she yelled over the phone, "whether you like it or not, you will lose your break!" and hung up, Martin Decl. ¶ 19; Pl.'s Opp'n 23; and (7) on February 16, 2005, Manager Carr and ASM Hogan told Martin not to speak to anyone at work about his sexual harassment complaint.[6]  Martin Decl. ¶ 22; Pl.'s Opp'n 20-26.[7]

On February 17, 2005, Martin filed his first Formal Complaint of Discrimination with the EEO ("First EEO Complaint") for race, color, disability, national origin, and sex discrimination and for retaliation.  Martin Decl. ¶ 23; Pl.'s Ex. 6.  On the same day, Martin gave Admin. Campbell a written account of retaliation he claims occurred after his November 12, 2004 report of sexual harassment.  Martin Decl. ¶ 24; Pl.'s Ex. 7.  At Campbell's request, he supplemented his report on February 22, 2005.  Martin Decl. ¶ 26; Pl.'s Ex. 8.

---

[6]  Manager Carr claims that sometime in January 2005 she told Martin to stop discussing his sexual harassment claim during work hours because she "received complaints from other cashiers . . . that Mr. Martin was making them uncomfortable and interfering with their work by persistently talking to them about his sexual harassment case and making repeated unwelcome calls to their personal telephones."  Carr Decl. ¶ 5; *see also* Hogan Decl. ¶ 2.

[7]  Plaintiff initially also alleged two further incidents as adverse actions -- berating Martin for giving a customer a sub-total and falsely accusing him of not checking identification cards at the entrance.  *See* Martin Decl. ¶¶ 25, 27.  At the hearing, Plaintiff's counsel acknowledged that these incidents occurred prior to Martin's November 12, 2004 report of sexual harassment and, therefore, conceded those actions were not adverse.

After this, Martin alleges he suffered the following adverse

employment actions in further retaliation for reporting sexual harassment and

filing his First EEO Complaint: (1) ASM Hogan yelled at him to clean a register

where he did not work after his shift ended in July 2005, Martin Decl. ¶ 30; Pl.'s

Opp'n 25; (2) ASM Hogan yelled, "Phillip, you are only 'intermittent' you don't

have a schedule like the part-timers and the full-time employees!" in July 2005,

Martin Decl. ¶ 31; Pl.'s Opp'n 23; (3) on September 1, 2005, ASM Hogan yelled

at him, falsely accusing him of counting money at the register, Martin Decl. ¶ 32;

Pl.'s Opp'n 25; and (4) on or about October 8, 2005, ASM Hogan told him to

change his time sheet to reflect that he was fifteen minutes late on September 1,

2005.  Martin Decl. ¶ 33; Pl.'s Opp'n 25.[8]

Martin stopped working at the Commissary on November 14, 2005

due to "anxiety, depression/harassment."  Martin Decl. ¶ 38; Pl.'s Ex. 15.

On November 29, 2005, Admin. Campbell wrote Martin a letter:

(1) demanding documentation of his medical condition by December 4, 2005 and

threatening him with AWOL status and eventual termination if he failed to provide

a proper and timely response or return to work; and (2) providing the necessary

---

[8] On October 14, 2005, Martin wrote a letter to Alan Asperas, Director of the
Commissary, complaining that ASM Hogan was harassing and mistreating him at work.  Martin
Decl. ¶ 34; Pl.'s Ex. 11.

forms if Martin wished to resign.  Pl.'s Ex. 13; Martin Decl. ¶ 36; Am. Campbell

Decl. ¶ 2.  Plaintiff asserts that this letter singled him out, was designed "to harass

and to coerce [him] into resigning[,]" and is an example of the "discriminatory

actions" Admin. Campbell put him through over the years.  Pl.'s Ex. 14.  Admin.

Campbell claims that she asked for this information because Martin had been out

on sick leave without a definite statement as to what was wrong with him, when he

might return, or what medical restrictions might allow him to return to work and

because she heard correctly he was working at another job.  Am. Campbell Decl.

¶ 2; Pl.'s Ex. 13.

        Sometime after December 8, 2005, Martin provided Admin. Campbell

with a note from Dr. Peter J. Dee, an internist, stating that Martin was under Dr.

Dee's care and that Martin could work at his second job but could not work at the

Commissary due to due to "anxiety, depression/harassment[.]"  Pl.'s Ex. 15, at 1;

Martin Decl. ¶ 38.  Because Martin provided the requested information, Campbell

did not take further action.  Am. Campbell Decl. ¶ 2.  ASM Hogan, however,

wrote an undated letter sometime after Martin provided Dr. Dee's note, requesting

further documentation of Martin's illness from a psychiatrist.  Pl.'s Ex. 16; Martin Decl. ¶ 39.[9]

As part of a DeCA wide reorganization, Martin -- along with all of the other Cashiers at the Commissary -- received a letter from Admin. Campbell entitled "Reduction-in-Force -- Notice of Reassignment."  Martin Decl. ¶ 42; Pl.'s Ex. 18.[10]  The letter informed Martin that his position as Cashier was being abolished and offered him a choice between accepting a new position of Store Associate[11] or resigning.  *Id.*  Like the other Commissary Cashiers, Martin's reassignment had no effect on his hours, wages, or benefits.  Am. Campbell Decl. ¶ 3.  Although Martin does not dispute that the reassignment was DeCA-wide, he does allege his reassignment was reprisal for his prior EEO activity and that he accepted the new position on August 1, 2006 under duress of termination while he was on extended sick leave.  Martin Decl. ¶ 47; Pl.'s Ex. 18, at unmarked page 9.

---

[9]  The first note from Dr. Dee refers to him only as a Doctor of Internal Medicine, but the later notes state "psychiatrist" or "psychiatry" added by hand.  *See* Pl.'s Ex. 15.

[10]  Campbell states that she first informed Martin of his reassignment by letter in December 2005, Am. Campbell Decl. ¶ 3, but the letter is dated July 24, 2006.  Martin Decl. ¶ 42; Pl.'s Ex. 18.  Viewing the facts in the light most favorable to Plaintiff, the court adopts Plaintiff's version of events in the analysis below.

[11]  Store Associate duties include those of a Cashier and add a set of broader responsibilities including handling, preparing, and maintaining stock of the grocery and produce items, working in one or more departments within the store and performing rotational assignments within all departments, re-stocking items, and assisting customers.  Pl.'s Ex. 18, at unmarked pages 4-6; Am. Campbell Decl. ¶ 3.

Martin never returned to work, however, and has been on leave without pay since late 2005.  Martin Decl. ¶ 38; Am. Campbell Decl. ¶ 3.

On September 20, 2006, Martin filed a second EEO complaint alleging that Defendants reassigned him in retaliation for his First EEO Complaint. Martin Decl. ¶ 47.

## B.    Procedural History

On October 10, 2007, Plaintiff filed his Complaint.  On August 20, 2008, Defendants filed a Motion for Summary Judgment.  On September 11, 2008, Plaintiff filed his Opposition.  On September 18, 2008, Defendants filed a Reply. A hearing was held on September 29, 2008.

## III.  STANDARD OF REVIEW

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Rule 56(c) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (*citing Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004). "When the moving party has carried its burden under Rule 56(c) its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [and] come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (A party cannot "rest on mere allegations or denials of his pleading" in opposing summary judgment).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. An issue is material if the resolution of the factual dispute affects the outcome of the claim or defense under substantive law governing the case. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001). When considering the evidence on a motion for summary judgment, the court must draw all reasonable

10

inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## IV. <u>ANALYSIS</u>

Defendants argue that Plaintiff fails to demonstrate a prima facie case of retaliation, and Plaintiff has not sufficiently rebutted Defendants' legitimate explanations for their actions. For the foregoing reasons, the court GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment.

## A.      Retaliation Legal Framework

Title VII makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a); *see Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) ("Title VII's anti-retaliation provision forbids employer actions that discriminate against an employee . . . because he has opposed a practice that Title VII forbids or has made a charge, testified, assisted, or participated in a Title VII investigation, proceeding, or hearing." (citations and internal quotation signals omitted)).

The parties agree that the *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), framework applies to this case. Thus, Plaintiff has the initial

burden to establish a prima facie case of retaliation. *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th Cir. 2007). To make a prima facie case of retaliation, Plaintiff must show that (1) he engaged in a protected activity; (2) Defendants took an adverse action against him; and (3) there was a causal link between his involvement in the protected activity and Defendants' adverse personnel action. *Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004). "The requisite degree of proof necessary to establish a *prima facie* case for Title VII . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148 (9th Cir. 1997) (citation omitted).

After Plaintiff establishes a prima facie showing of discrimination, the burden of production under the *McDonnell Douglas* framework shifts to Defendants to forward a legitimate -- which is to say non-retaliatory -- reason for its actions. *McDonnell Douglas Corp.*, 411 U.S. at 802. If Defendants do so, the burden shifts back to Plaintiff to show that the given reason is merely pretext for a retaliatory motive. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006); *see also Nilsson v. City of Mesa*, 503 F.3d 947, 954 (9th Cir. 2007) (stating that plaintiff "bears the ultimate burden of submitting evidence

indicating that the [defendants'] proffered reason is merely a pretext for a retaliatory motive." (citation and internal quotation signals omitted)).

To show pretext, Plaintiff must do more than merely deny the credibility of Defendants' proffered reason. *See Schuler v. Chronicle Broad. Co.*, 793 F.2d 1010, 1011 (9th Cir. 1986). "A plaintiff can show pretext directly, by showing that [retaliation] more likely motivated the employer, or indirectly, by showing that the employer's explanation is unworthy of credence." *Vasquez v. County of L.A.*, 349 F.3d 634, 641 (9th Cir. 2003). Plaintiff can make either showing through direct or circumstantial evidence. *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005). "Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory [or retaliatory] statements or actions by the employer." *Id.* Circumstantial evidence requires an additional inferential step to demonstrate retaliation. *Id.* In order to survive summary judgment, the circumstantial evidence offered by Plaintiff "must be 'specific and substantial' to defeat the employer's motion for summary judgment."[12] *Id.* (citation omitted);

---

[12] Although *Cornwell v. Electra Central Credit Union*, 439 F.3d 1018, 1030-31 (9th Cir. 2006), questioned whether a "specific and substantial" showing is required, the three-judge panel did not overrule the applicability of this standard. In fact, *Nilsson v. City of Mesa*, 503 F.3d 947, 954 (9th Cir. 2007), applied the "specific and substantial" standard after *Cornwell* questioned its applicability.

*Mondero v. Salt River Project*, 400 F.3d 1207, 1213 (9th Cir. 2005); *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 743 (9th Cir. 2004).

**B.     Plaintiff's Prima Facie Case of Retaliation**

The first prong of Plaintiff's prima facie cases is not in issue -- Martin clearly engaged in protected activities.  The court thus turns to whether the alleged retaliatory acts Martin suffered constitute adverse employment actions.

Defendants argue that none of Martin's allegations rises to the level of an adverse employment action.  Based on the evidence presented, the court finds that only Defendants' threats of disciplinary action and termination rise to the level of materially adverse actions.

*Burlington* states that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting charge of discrimination." *Burlington*, 548 U.S. at 68 (citation and quotation signals omitted).  Petty slights or minor annoyances are not materially adverse -- Plaintiff must show "retaliation that produces an injury or harm." *See id.* at 67.  As such, making negative comments or bad-mouthing an employee is not an adverse action. *See Somoza v. Univ. of Denver*, 513 F.3d 1206, 1219 (10th Cir. 2008) ("[I]t cannot be said that negative comments, [and] condescending

looks . . . produce material and adverse actions."); *Brooks v. City of San Mateo*, 229 F.3d 917, 928-29 (9th Cir. 2000) (stating that "badmouthing" an employee does not constitute an adverse employment action in context of Title VII retaliation). Threats, however, may rise to the level of an adverse employment action, if under the particular circumstances, those threats would have deterred a reasonable employee from making or supporting a charge of discrimination. *See Burlington*, 548 U.S. at 68; *Lee v. Winter*, 439 F.Supp. 2d 82, 85 (D.D.C. 2006) (finding threat of reduced compensation constitutes materially adverse action after *Burlington*); *see also Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1090 (10th Cir. 2007) ("We do not doubt that a reasonable employee could well find . . . a combination of threats and actions taken with the design of imposing both economic and psychological harm sufficient to dissuade him or her from making or supporting a charge of discrimination.").

An employment change that similarly impacts all like situated employees -- as opposed to targeting one particular employee -- is not an adverse employment action. *See Weger v. City of Ladue*, 500 F.3d 710, 726-27 (8th Cir. 2008). For example, *Weger* found that directives issued to all communications officers "were not materially adverse because they were issued to the Department as a whole, resulted in only minor changes in workplace procedure, and impacted

Plaintiffs in the same way as all other communications workers."  *Id.* at 726; *see also Somoza*, 513 F.3d at 1215 (finding action insufficiently adverse under *Burlington* because "no facts [were] produced that indicate [plaintiffs] were targeted specifically"); *Jordan v. Chertoff*, 224 Fed. Appx. 499, 501 (7th Cir. 2007) (noting post-*Burlington* plaintiff may present prima facie case of retaliation by showing "only [he], and not any similarly situated employee who did not take protected action, was subjected to a materially adverse action . . . .").  The court reasoned: "It simply does not follow that an employer's announcement of a new policy that affects all or substantially all of its employees in the same manner would so adversely affect the Plaintiffs' lives that it would have dissuaded them from reporting [] harassment."  *Weger*, 500 F.3d at 727.

In determining what constitutes an adverse employment action, the court may examine the actions in the aggregate.  *See Somoza*, 513 F.3d at 1219; *Billings v. Town of Grafton*, 515 F.3d 39, 54 n.13 (noting "retaliatory actions that are not materially adverse when considered individually may collectively amount to a retaliatory . . . environment"); *Devin v. Schwan's Home Serv., Inc.*, 491 F.3d 778, 787-88 (8th Cir. 2007) (evaluating employer's actions cumulatively and noting "where an employer engages in extreme, systemic retaliatory conduct resulting in serious employment consequences . . . such conduct might very well

16

meet the [*Burlington*] standard").  Although *Burlington* evaluated each action

individually, the Supreme Court emphasized that "[c]ontext matters."  *Burlington*,

548 U.S. at 69.

Accordingly, the court examines Martin's multiple alleged adverse

actions individually prior to examining them in the aggregate.

### 1.    *Actions Directly Related to Martin's Sexual Harassment Complaint*

Plaintiff argues that his supervisors' acts of being dismissive of his

complaint, Martin Decl. ¶ 9, refusing to give him Nickels' counter-allegations or

talk to him without a union representative present, *id.* ¶ 11, providing false

information about Nickels' counter-complaint, *id.* ¶¶ 13, 14, and requesting he not

discuss his sexual harassment complaint at work, *id.* ¶ 22, were materially adverse.

Examined in the light most favorable to Plaintiff and considering the

particular circumstances, none of these actions would stop a reasonable worker

from making a charge of discrimination.  It is wholly unsurprising that a

supervisor would refuse to provide an employee with a copy of the allegations

against him during an investigation or decline to speak with someone who recently

filed a sexual harassment complaint without a union representative present.  Also,

there is nothing materially adverse in telling an employee not to discuss his sexual

harassment claim at work or informing an employee of a co-worker's plan to file a

counter-complaint.  Even Martin's supervisors' verbal dismissals of his claim --

for example, stating they "had no effect at all" or were "nothing" -- fail to produce

the necessary injury or harm that would keep an objectively reasonable employee

from filing a complaint.

Further, while Plaintiff has stated the *Burlington* standard and

provided a laundry list of alleged adverse actions, he does not apply the

*Burlington* standard to any of his facts.  In other words, he provides no context to

explain how these particular actions impacted his particular employment.  Under

these circumstances, the court cannot find that these actions would deter a

reasonably, objective employee in Plaintiff's position from engaging in protected

activity.

Because Plaintiff has failed to raise a genuine material issue of

whether these actions, on this record, are materially adverse, the court GRANTS

Defendants' Motion for Summary Judgment on Plaintiff's retaliation claim to the

extent it is based upon ¶¶ 9, 11, 13, 14, 22 of his Declaration.

## 2.     *The Trivial Actions*

A number of the actions Plaintiff claims are materially adverse are

mere trivial acts that lack the harm to support a prima facie case of retaliation

under *Burlington*.

18

    *a.    Petty slights and minor inconveniences*

Plaintiff asserts that after he reported sexual harassment, his supervisors retaliated against him by: (1) ordering Martin to take his fifteen minute lunch break after 6:00 p.m., forcing him to take his next break immediately afterward, and yelling "whether you like it or not, you will lose your break!" when he resisted, Martin Decl. ¶ 19; Pl.'s Opp'n 23; (2) yelling at him to clean a register he did not work after he clocked out, Martin Decl. ¶ 30; Pl.'s Opp'n 25; (3) yelling, "Phillip, you are only 'intermittent' you don't have a schedule like the part-timers and the full-time employees!" when he was looking at the schedule, Martin Decl. ¶ 31; Pl.'s Opp'n 23; (4) falsely accusing him of counting money at the register, Martin Decl. ¶ 32; Pl.'s Opp'n 25; and (5) wrongly insisting he change his time sheet to reflect that he was fifteen minutes late on September 1, 2005.  Martin Decl. ¶ 33; Pl.'s Opp'n 25.

    The court finds that each of these five events -- even if unjust and unpleasant -- would not dissuade a reasonable employee from making a complaint and therefore are not adverse employment actions.

    Although Martin's supervisors may have undeservingly raised their voices and treated him harshly, generally bad-mouthing, yelling at, or even mildly reprimanding an employee is a mere petty slight and fails to qualify as a materially

19

adverse action.  *Brooks*, 229 F.3d at 928-29 ("[B]admouthing an employee . . .

do[es] not constitute [an] adverse employment action[].");  *Billings*, 515 F.3d at 54

(finding that "upbraiding" and "criticizing" plaintiff amounted to mere petty

slights);  *Nolan v. Swartz Campbell, LLC*, 2008 WL 598291, at *20 (W.D. Pa. Feb.

29, 2008) ("Being yelled at by a supervisor for making a complaint . . . , while

inappropriate and no doubt unpleasant, does not reflect materially adverse

action.");  *see also Devin*, 491 F.3d at 786 (finding unfair discipline without actual,

adverse consequences produced only trivial harm, not material action).  Further,

forcing Martin to take a late lunch, go on an inconvenient break, perform the

routine task of cleaning a register (even one he did not use after his shift ended),

or making him modify his time-sheet -- without more -- are just minor annoyances

all employees face.  *See, e.g.*, *Aryain v. Wal-mart Stores Texas LP*, 534 F.3d 473,

485-86 (5th Cir. 2008) (finding that employer's denial of break requests and

requirement that plaintiff perform routine undesirable tasks were "minor

annoyances" and not adverse employment actions);  *Carmona-Rivera v. P.R.*, 464

F.3d 14, 20 (1st Cir. 2006) (finding defendants' delay in providing disability

accommodation mere inconvenience with no adverse harm);  *Roldan v. Chertoff*,

2006 WL 4632503, at *10 (S.D. Cal. Oct. 19, 2006) (noting that refusing a

schedule change and denying two hours leave is not "materially adverse").

Further, without Plaintiff's explanation of how the *Burlington*
standard applies to his specific set of facts, the court cannot hypothesize how these
seemingly trivial actions would keep an objectively, reasonable employee from
making a complaint of discrimination.[13]

>    b.    *Working with Nickels*

Martin also asserts that Manager Carr's "mess up" of scheduling him
with Nickels on January 15, 2005 constitutes an adverse employment action.  Pl.'s
Opp'n 22; Martin Decl. ¶ 15.

Manager Carr states -- and Martin does not deny -- that she arranged
for them to work at opposite ends of the Commissary and told Martin that he could
leave work (albeit without pay) if he felt uncomfortable.  *See* Carr Decl. ¶ 3;
Martin Decl. ¶ 15.  Considering these circumstances, Manager Carr's inadvertently
scheduling Martin and Nickels for the same shift would not deter a reasonable

---

[13] Defendants proffer a legitimate, non-retaliatory reason for all five actions in this
section -- namely that ASM Hogan managed Martin as she did all Commissary cashiers.  *See*
Hogan Decl. ¶¶ 3-7.  Although Martin asserts that he was unjustly targeted in each instance, *see*
Martin Decl. ¶¶ 83, 85-86, he must do more than merely deny Hogan's credibility.  *See Schuler v.
Chronicle Broad. Co.*, 793 F.2d 1010, 1011 (9th Cir. 1986).  Because Martin has not met his
burden to show Hogan's reason is mere pretext, these acts cannot serve as a basis for his
retaliation claim.

person from making a complaint,[14] and therefore, is not an adverse employment

action.[15]

Because there is no genuine material question that the acts discussed

in this section are *not* materially adverse, Plaintiff has not met his burden to show

a prima facie case of retaliation based upon these acts.  Accordingly, the court

GRANTS Defendants' Motion for Summary Judgment on Plaintiff's retaliation

claim based upon the acts stated in ¶¶ 15, 19, 30, 31, 32, 33 of his Declaration.

### 3.    *Requests for Documentation of Martin's Medical Condition*

Plaintiff argues that the two letters requesting documentation of his

medical condition are adverse employment actions.  *See* Pl.'s Opp'n 25-26; Pl.'s

Ex. 13; 16.  Considering all of the circumstances in the light most favorable to

Plaintiff, however, Defendants' requests for documentation to support his leave of

absence would not dissuade a reasonable worker from making a complaint of

discrimination.  While the letters state Martin may be subject to discipline or

---

[14] Martin worked with Nickels on one other occasion after he complained of sexual harassment, but he does not assert that was an adverse employment action.  *See* Martin Decl. ¶ 16; Pl.'s Opp'n 20-26.

[15] Defendants offer the legitimate, non-retaliatory motive that scheduling Nickels and Martin together was simply a mistake.  Carr Decl. ¶ 3.  In fact, Plaintiff notes that Manager Carr told him she "messed up the schedule."  Martin Decl. ¶ 22.  Because Plaintiff has not met his burden to show how this explanation is pretext, this schedule mis-hap cannot serve as a basis for Martin's retaliation claim.  *See Cornwell*, 439 F.3d at 1018.

termination if he fails to comply, these letters were mailed while Plaintiff was out on medical leave for at least two weeks and after he admitted working at another job. *See* Martin Decl. ¶ 38; Pl.'s Exs. 13, 16. Considering the context, an objectively reasonable person would not fail to file a discrimination claim because his employer would request documentation after a two-week absence. *See, e.g.*, *Sebastian v. City of Chi.*, 2008 WL 2875255, at *26 (N.D. Ill. July 24, 2008) (finding request that plaintiff provide medical documentation for sick leave is a "minor slight" and not an adverse action).

Plaintiff has also failed to establish the third prong of a retaliation claim -- the causal link between his sexual harassment and EEO complaints and these letters. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002). Plaintiff reported sexual harassment on November 12, 2004 and filed his First EEO Complaint on February 17, 2005. Martin Decl. ¶¶ 8, 23. Admin. Campbell's letter is dated November 29, 2005 and ASM Hogan's letter was sent sometime later. Pl.'s Exs. 13, 16. Because these letters were sent over eight months after Plaintiff filed his First EEO Complaint and because Plaintiff has put forward no other evidence of a causal link, the third prong of Martin's retaliation claim fails.[16] *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74

---

[16]  While Martin wrote a letter to Alan Asperas, Director of the Commissary, complaining
(continued...)

(2001) (per curiam) (citing with approval cases that found gaps of three and four months to be too long to establish temporal proximity under Title VII); *Villiarimo*, 281 F.3d at 1065 (same for four, five, and eight months).[17]

Because Plaintiff has not put forth a prima facie case of retaliation based upon the medical letters, the court GRANTS Defendants' Motion for Summary Judgment on Plaintiff's retaliation claim as to those letters.

### 4.   *Martin's Reassignment from Cashier to Store Associate*

Plaintiff asserts that his reassignment from Cashier to Store Associate was an adverse employment action in retaliation for his report of sexual harassment and subsequent EEO complaints.  *See* Pl.'s Opp'n 26.  Martin's reassignment, however, was part of a DeCA-wide reorganization where each and every Cashier at the Commissary was also reassigned.  Martin's bald claim that the reassignment was reprisal for his EEO activity, *see* Martin Decl. ¶ 47; Pl.'s Ex. 22, at I-11, does not change the fact that Martin has no put forth no evidence that the

---

[16](...continued)
that ASM Hogan harassed and mistreated him at work on October 15, 2005, he has not produced any evidence showing that Admin. Campbell or ASM Hogan had knowledge of that letter. Martin Decl. ¶ 34; Pl.'s Ex. 11.

[17]  Defendants proffer that they requested medical documentation because Martin was out of work and admitted working at another job.  *See* Campbell Am. Decl. ¶ 2; Pl.'s Ex. 13.  While Martin does not deny this, *see* Martin Decl. ¶ 38, he instead asserts without any support that these letters were sent to discriminate against him and that he was "signaled out."  *See* Pl.'s Ex. 14. Because Martin has failed to meet his burden to show Campbell's reason is mere pretext, his retaliation claim based upon these letters fails.

reassignment in any way singled him out.  Because the reassignment did not target

Martin individually, it is not an adverse employment action under *Burlington*.  *See*

*Weger*, 500 F.3d at 727 ("It simply does not follow that an employer's

announcement of a new policy that affects all or substantially all of its employees

in the same manner would so adversely affect the Plaintiffs' lives that it would

have dissuaded them from reporting . . . harassment."); *see also Somoza*, 513 F.3d

at 1215-16.

Further, where -- as is the case here -- a plaintiff does not show *how* a

job reassignment would dissuade a reasonable employee from making a complaint,

there is no adverse employment action.  *See, e.g.*, *Dicampli v. Korman Cmtys.*, 257

Fed. Appx. 497, 501 (3d Cir. 2007) (finding job transfer not adverse action where

new position had identical pay and benefits and plaintiff failed to put forth

evidence that new job was less desirable or prestigious); *Higgins v. Gonzales*, 481

F.3d 578, 590-91 (8th Cir. 2007) (finding transfer not adverse action where

plaintiff did "not allege new position was qualitatively more difficult or less

desirable" than previous one); *Tudor Delcey v. A-Dec, Inc.*, 2008 WL 123855, at

*11 (D. Or. Jan. 9, 2008) (granting summary judgment on plaintiff's claim that

defendant retaliated against him by assigning him from woodworking to the

laminate area because beyond his testimony that he was "'unhandy,'" he "provided

25

no evidence to support a finding that a reasonable employee would find the change to be materially adverse"); *Cf. Burlington*, 548 U.S. at 71 (holding transfer from position that was "objectively considered a better job" to a position that was "by all accounts more arduous and dirtier" may be an adverse employment action).[18]

On the record before the court, Plaintiff's job reassignment from Cashier to Store Associate is not a materially adverse employment action as a matter of law.  Therefore, the court GRANTS summary judgment on Plaintiff's retaliation claim as to his reassignment from Cashier to Store Associate.

### 5.   *Actions in the Aggregate*

The court acknowledges that actions found insufficiently adverse when considered individually may collectively rise to the level of a materially adverse employment action.  *See Billings*, 515 F.3d at 54 n.13; *Somoza*, 513 F.3d at 1219.  Plaintiff alleges fifteen discrete adverse acts over a period of nineteen

---

[18]  Plaintiff incorrectly asserts that *Burlington* held that the question of whether reassignment of duties constitutes a materially adverse action is always a jury question. *See* Pl.'s Opp'n 26.  On its specific facts, *Burlington* holds that whether the move from fork-lift operator to standard track laborer constitutes a materially adverse action is a question for the jury where the evidence showed "track laborer duties were 'by all accounts more arduous and dirtier'; that the 'forklift operator position required more qualifications, which is an indication of prestige'; and that 'the forklift operator position was objectively considered a better job and the male employees resented [plaintiff] for occupying it[.]" *Burlington*, 548 U.S. at 71.  Because Martin was not signaled out, his duties stayed essentially the same, and he presents no evidence that being a Store Associate is any less prestigious, more arduous, or in any way worse than being a Cashier, no jury question exists here.  *See id.*

months, most of which consist of relatively mild reprimands, petty slights, routine requests, or minor inconveniences. Even taken together, these actions -- excluding the threats of disciplinary action and termination discussed below -- fail to rise to the level necessary to chill an objectively, reasonable worker from making or supporting a claim of discrimination.

### 6.    *Threats of Disciplinary Action and Termination*

Defendants' December 9, 2004 and January 19, 2005 threats of severe disciplinary action and termination are certainly "harmful to the point that . . . could well dissuade a reasonable worker from making or supporting a charge of discrimination." *See Burlington*, 548 U.S. at 57. On December 9, 2004, Martin was told by his supervisors that if he did not apologize to Nickels and withdraw his sexual harassment complaint his employment "would be affected;" he would receive a letter of reprimand; or he would lose his job. Martin Decl. ¶ 10. On January 19, 2005, two of Martin's supervisors told him to "mind [his] own business or be subject to severe disciplinary action!" *Id.* ¶ 18. Certainly, threats of this kind -- up to and including severe discipline and termination -- may be sufficient to cause a reasonable employee to shy away from lodging a sexual harassment complaint. The court, therefore, finds Plaintiff has put forth prima facie evidence of a material adverse action as to Defendants' threats.

Defendants argue that the December 9, 2004 and January 19, 2005 threats lack the harm required under *Burlington* because no "actual" personnel or disciplinary actions were taken.  *See* Defs.' Reply 6; Defs.' Mot. in Supp. 8-9, 11. Defendants miss the mark -- the court does not focus on actual harm but on the potential for deterrence.  Indeed, threats may be materially adverse if they would deter a reasonable person from engaging in protected activity.  *See, e.g., Billings*, 515 F.3d at 54-55 (finding employee who "knows that by [reporting discrimination he] risks a formal investigation and reprimand -- including a threat of further, more serious discipline[,]" may be deterred) (internal quotation signals omitted); *Williams*, 497 F.3d at 1090 (finding combination of threats and actions could dissuade reasonable employee); *Lee*, 439 F. Supp. 2d at 85 (finding threat of reduced compensation supports a claim of retaliation under Title VII); *Killen v. Nw. Human Servs., Inc.*, 2007 WL 2684541, at *7 (E.D. Pa. Sept. 7, 2007) (finding "that the threat of placement on administrative leave and the threat of a formal audit could have dissuaded a reasonable employee from making a discrimination claim"); *E.E.O.C. v. Collegeville/Imagineering*, 2007 WL 2051448, at *8 (D. Ariz. July 16, 2007) (concluding plaintiff put forth prima facie evidence of material adverse action by showing supervisor with requisite power threatened to terminate plaintiff if she continued to engage in protected activity); *Coleman v. Bronson*

28

*Methodist Hosp.*, 2006 WL 3391404, at *11 (W.D. Mich. Nov. 21, 2006) (finding that placing an employee on probation with the threat that it is the employee's "last chance" before termination may dissuade reasonable employee); *Walsh v. Irvin Stern's Costumes*, 2006 WL 2380379, at *2 (E.D. Pa. Aug. 15, 2006) ("A fair reading of [*Burlington*] reveals that the case imposes no requirement that a threat be fulfilled."); *see also Faircloth v. Bowers*, 2007 WL 593042, at *9 (E.D. Ark. Feb. 20, 2007) (applying *Burlington* to state law claim to find adverse action would exist if jury found defendant threatened to fire plaintiff, among other things).[19]

Plaintiff has also met his burden to show that a causal link exists between Defendants' threats and his protected activity.  A court may infer causation from the proximity of the timing between a plaintiff's protected activity and a defendant's actions.  *Ray v. Henderson*, 217 F.3d 1234, 1244 (9th Cir. 2000) ("That an employer's actions were caused by an employee's engagement in protected activities may be inferred from 'proximity in time between the protected action and the allegedly retaliatory employment decision.'" (*quoting Yartzoff v.*

---

[19]  Defendants' reliance on *Kerns v. Capital Graphics*, 178 F.3d 1011 (8th Cir. 1999), is misplaced.  *Kerns* applied pre-*Burlington* Eighth Circuit law requiring that the offending behavior produce a "material employment disadvantage" to be an adverse employment action. *Kerns* does not survive *Burlington*.

*Thomas*, 809 F.2d 1371, 1371 (9th Cir. 1987)); *see also Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 507 (9th Cir. 2000).

Martin alleges that the threats on December 9, 2004 occurred in a meeting where his supervisors explicitly asked him to rescind his sexual harassment complaint made less than one month prior.  *See* Martin Decl. ¶¶ 8, 10. The January 19, 2005 threat of severe disciplinary action occurred only two months after Martin reported sexual harassment to Manager Carr and just nine days after he first called the EEO office.  *See id.* ¶¶ 8, 14, 17, 18.  Manager Carr, ASM Hogan, and HR Manager Borja were aware of Martin's sexual harassment complaint on November 12, 2004, and Hogan -- the supervisor who Martin claims made the January 19 threat -- had reason to believe he was in touch with the EEO office as of January 10, 2005.  *See* Martin Decl. ¶ 14.  These facts are sufficient for a reasonable jury to infer Martin's protected activity brought about Defendants' threats.  Accordingly, Martin has made a prima facie claim of retaliation for Defendants' December 9, 2004 and January 19, 2005 threats.

**C.    Defendants Have Not Proffered Legitimate Reasons for Their Threats**

Under the *McDonnell Douglas* burden shifting framework, after Plaintiff establishes a prima facie showing of discrimination, the burden of production shifts to Defendants to forward a legitimate, non-retaliatory reason for

their actions.  *McDonnell Douglas Corp.*, 411 U.S. at 802.  Defendants have not

offered a legitimate, non-retaliatory reason for Manager Carr and ASM Hogan's

threats made on January 19, 2005.  While Defendants argue that Martin's

supervisors made the December 9, 2004 threats as part of an "attempt to resolve

the dispute between two employees and to warn plaintiff of potential

consequences if the matter went forward[,]" *see* Defs.' Reply 6, Defendants

present no evidence -- no declaration, no deposition testimony, no documents -- to

support this statement.  In fact, none of the supervisors' declarations addresses the

December 9, 2004 or January 19, 2005 meetings.  *See* Carr Decl.; Am. Campbell

Decl.; Hogan Decl.  Where Defendants have the burden of production, they cannot

rely on mere argument.  *See McDonnell Douglas Corp.*, 411 U.S. at 802.

Accordingly, the court DENIES Defendants' Motion for Summary

Judgment with regard to the threats made on December 9, 2004 and January 19,

2005.

## V.  <u>CONCLUSION</u>

For the reasons above, the court GRANTS Defendants' Motion for

Summary Judgment of Plaintiff's retaliation claim for all actions except for the

///

///

31

December 9, 2004 and January 19, 2005 threats.  As to the those threats, the court

DENIES Defendants' Motion for Summary Judgement.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, October 20, 2008.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Martin v. Robert M. Gates, et al.*, Civ. No. 07-00513 JMS/BMK, Order Granting in Part and
Denying in Part Defendants' Motion for Summary Judgment